*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-1607**

In the Matter of the Welfare of the Child of:
B. Q.-R. H., Mother AKA B. Q. R. H. AKA B. Q.-R. H. AKA B. Q. R. H.
and F. L. P., Alleged Father AKA F. L. P.

**Filed April 29, 2024**
**Affirmed**
**Larkin, Judge**

Olmsted County District Court
File No. 55-JV-22-5271

Daniel T. Donnelly, Donnelly Law Office, Austin, Minnesota (for appellant B. Q.-R. H.)

Dan Irwin, Irwin Law Office PLC, Dundas, Minnesota (for appellant F. L. P.)

Mark Ostrem, Olmsted County Attorney, Deanna S. Varga, Associate County Attorney, Rochester, Minnesota (for respondent county)

Considered and decided by Ross, Presiding Judge; Larkin, Judge; and Klaphake, Judge.[*]

**NONPRECEDENTIAL OPINION**

**LARKIN**, Judge

Appellant-mother and appellant-father challenge the termination of their parental rights. Mother argues that the district court abused its discretion by finding that respondent-county proved three statutory grounds for termination, that the county made

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

reasonable reunification efforts, and that termination was in the child's best interests. Mother also argues that the district court's failure to explain its credibility determinations violated her right to procedural due process. Father argues that he was improperly served and that the district court erred by authorizing a default proceeding against him. We affirm.

**FACTS**

Appellant-mother, B.Q.R.H., is the biological mother of T.P.S.T.H. (the child) born in 2013. Appellant-father, F.L.P., is the alleged father of the child. The child has a younger sister, D.B.R.H., who was born in 2018.[1] The child is not a member of or eligible for membership in any Indian tribe.

In early 2022, the child's school expressed concerns to respondent Olmsted County Health and Human Services (the county) about the child's poor attendance, aggressive behavior, and suspected physical abuse. The child threw chairs and desks, chased staff with scissors, climbed on lockers, regularly left the classroom, tried to leave the building, tried to attack other students, and slept for hours—or for the entire day—while at school. On one occasion, staff were forced to remove the child's classmates from the classroom because the child was uncontrollable despite the efforts of multiple adults to calm him.

When the school attempted to contact mother to address the child's behavior, she was difficult to reach. On one occasion, when the school managed to contact mother, she complained that the school had interrupted her shopping trip to the cities. On another occasion, mother and father appeared at school to retrieve the child. A school social worker

---

[1] D.B.R.H. is the subject of a separate child-protection proceeding (No. A23-1608). Mother is the biological parent of D.B.R.H. Appellant father is not D.B.R.H.'s father.

2

observed father grab and twist the child's ear. The child looked frightened, but he told the social worker that "he was used to it." The child later reported that his parents withheld his dinner that evening and that his father slapped him and twisted his arm.

Those events led to a child-maltreatment report alleging physical abuse. The report also alleged that mother smelled strongly of marijuana whenever she came to the child's school, that her residence smelled of marijuana, and that the then-eight-year-old child had been left to care for his then-three-year-old sister while mother worked overnight.

In March 2022, the county commenced case-management services and developed a case plan for mother that addressed mother's parenting skills, mental health, past trauma, and marijuana use. The county provided the following services for mother: mental-health referrals, chemical-health counseling, parenting-skills coaching, basic needs/emergency assistance, financial support, supervised-parenting time, safety planning, and service coordination. Mother was unwilling to engage in the services, indicating that she did not need them. The case plan also addressed the child's well-being, including the need to obtain health insurance, schedule medical appointments, and secure basic necessities for the child.

Because the child expressed suicidal and homicidal ideation, medication was prescribed for the child, and the county worked to get the child into a partial-hospitalization program that offered intensive therapy. The county scheduled "bridging appointments" for the child to assess whether the child was stable enough for admission to the program. Mother attended the initial appointment, but she smelled strongly of marijuana. She missed several other appointments. Mother also failed to fill out required paperwork and did not

engage with the child's care providers. Because mother missed appointments and failed to give the child all recommended doses of his prescribed medication, the child was never admitted into the partial-hospitalization program.

### The "Gas-Station Incident"

On May 13, 2022, the county received a second report of alleged child maltreatment. The report alleged that the child slapped mother and ran to a gas station wearing only a pair of shorts, without a shirt or shoes. Mother testified that the child slapped her because she took her cell phone away from him after she observed him accessing inappropriate content. Mother stated that she responded by chasing the child around the neighborhood for approximately two hours. Mother also testified that she called law enforcement asking for help and told them that she was going to "whoop" the child.

Gas-station surveillance footage showed the child run into the building and sit alone at a table. The footage also showed mother entering the building holding a belt. Mother proceeded to chase the child through the aisles, as the child threw objects at mother. Mother eventually cornered the child, who was hiding behind bags of charcoal. Mother struck the child with a belt and closed fist while the child attempted to shield himself with his arms. Next, mother dragged the child out from the corner, sat on top of him, and continued to beat him. The child took shelter in a corner, and mother struck him several more times. Eventually, mother walked toward an exit but quickly returned to commence a second beating. An unidentified adult dragged the child out from the corner, and mother struck the child several more times. The record shows that mother struck the child approximately 40 times during the gas-station incident. Before leaving the scene, mother

walked in and out of the gas station while scolding the child. The second adult also scolded the child, who appeared to be crying.

Police were called to the scene. The child complained of hearing loss in his right ear and was transported to an emergency room. Mother's lashing left raised welts and bruises on the child's legs, chest, and back. Mother was arrested and charged with felony malicious punishment of a child and misdemeanor domestic assault. The district court hearing mother's criminal matter issued a domestic-abuse no-contact order (DANCO) prohibiting mother from contacting the child. Mother ultimately pleaded guilty to gross-misdemeanor malicious punishment of a child.

Following the gas-station incident, the child and his sister underwent forensic interviews. During the child's interview, he disclosed that mother whips him, but only when he is wearing a coat, and that he preferred when mother hit him on his hand. The child also recalled being disciplined with a shoe. The child's younger sister disclosed that when her brother is "bad" he is whooped with a belt. The doctor who facilitated the forensic interview concluded that the child exhibited "[post-traumatic-stress disorder (PTSD)] akin to a war vet[eran]." The child later disclosed to county social workers that he had been "whooped with a belt on more than one occasion." He also stated that some belts hurt less than others.

The county placed the child with his maternal great-grandmother and then moved him to his great-aunt T.S.'s home. Initially, the county incorrectly believed that mother could participate in supervised visitation with the child despite the DANCO. T.S. supervised mother's parenting time with the child. T.S. reported that supervised visits were

5

sporadic and chaotic. Eventually, the county had to supervise mother's parenting time because T.S. complained that mother was disrespectful and had threatened her.

In June 2022, mother attended three of six scheduled visits. The following month, two visits were discontinued because mother's behavior was inappropriate. On one occasion, mother refused to stop yelling, and the parenting-time supervisor had to remove mother from the building.

In August 2022, the child was hospitalized for homicidal and suicidal ideation after running into the street and expressing his desire to be hit by a car. The hospital eventually requested that there be no contact between mother and the child after mother became escalated and abruptly ended a phone call with the child. After the call, the child was highly concerned about his mother and became dysregulated. The child was moved to a long-term residential-treatment program and remained there from September 2022 to April 2023.

*Termination Petition*

On August 12, 2022, the county petitioned to terminate mother and father's parental rights to the child. Regarding mother, the petition alleged that (1) mother was palpably unfit to parent the child, (2) the child experienced egregious harm while in mother's care, and (3) the child was neglected and in foster care. At an emergency-protective-care hearing in August 2022, mother denied the allegations in the petition; father did not appear at the hearing. The following month, the county discontinued supervised visitation after learning that it was not allowed under the DANCO. The DANCO was lifted around March 2023, and the county suggested that mother write to the child. The county intended to keep

6

mother's letters until it could reinitiate contact between mother and the child. Mother refused, explaining that she was "[going to] get her kids back" before talking to them.

On November 9, 2022, the county filed an affidavit of diligent efforts to locate father, indicating that father's whereabouts were unknown. The county requested permission to serve father by publication. The district court granted the request. On March 21, 2022, the county filed an affidavit of publication.

On March 22, 2023, mother appeared for her scheduled termination-of-parental-rights (TPR) trial. At the trial, the county stated that father's whereabouts remained unknown. But social worker A.G. later testified that father had been incarcerated in three or four different states and that "even when he [was not] incarcerated there [was] . . . almost zero cooperation with [the county]." Because father failed to appear at the trial, the district court granted the county's request to proceed by default against father. Mother's trial began, but it ended in a mistrial after the district court learned that mother's attorney failed to provide her with significant portions of discovery. The district court discharged mother's attorney, appointed new counsel, and rescheduled mother's TPR trial to July 10, 2023.

### Termination Trial

In July 2023, the district court held a five-day TPR trial. The district court received 26 exhibits and heard testimony from 16 witnesses, including several social workers,

7

mental-health practitioners, a law-enforcement officer, the child's family members, the guardian ad litem (GAL), and mother.

At the termination trial, the district court heard testimony from county social workers A.G. and L.C. who were assigned to the child's case. A.G. testified regarding the county's reunification efforts. A.G. stated that her review of the gas-station footage led her to conclude that mother's conduct was malicious, inappropriate, and constituted egregious harm. She reasoned that physical discipline could cause physical harm, ruptured attachments, emotional harm, fear, worry, and insecurities. Both A.G. and L.C. testified that terminating mother's and father's parental rights to the child was in the child's best interests.

On October 9, 2023, the district court issued an order granting the county's petition for termination. The district court found that the county made reasonable reunification efforts and that it was in the child's best interests to terminate mother's and father's parental rights. The district court reasoned that, although the child loves mother, mother's behavior caused the child to no longer trust adults and that mother's inability to control her emotions continued to pose a safety risk to the child.

Mother and father appeal.

## DECISION

## I.

Mother challenges the district court's determinations that the county proved a statutory ground for termination, that the county made reasonable reunification efforts, and

8

that termination of her parental rights was in the child's best interests. Mother also complains that the district court did not explain its express credibility determinations.

Parental rights are terminated "only for grave and weighty reasons." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn. 1990). The petitioner must produce "clear and convincing evidence that . . . [a] statutory termination ground[] exists." *In re Welfare of C.K.*, 426 N.W.2d 842, 847 (Minn. 1988); *see* Minn. R. Juv. Prot. P. 58.03, subd. 2(a) ("[I]n a termination of parental rights matter involving a non-Indian child, the standard of proof is clear and convincing evidence."). A district court's decision in a termination proceeding must be based on conditions existing at the time of the termination. *In re Welfare of Child of T.D.*, 731 N.W.2d 548, 554 (Minn. App. 2007), *rev. denied* (Minn. July 17, 2007). There must be evidence that "the present conditions of neglect will continue for a prolonged, indeterminate period." *In re Welfare of Chosa*, 290 N.W.2d 766, 769 (Minn. 1980).

### A.

There are multiple statutory grounds for the involuntary termination of parental rights. *See* Minn. Stat. § 260C.301, subd. 1(b) (2022). This court will affirm a termination order if at least one statutory ground for termination is supported by clear and convincing evidence and termination is in the best interests of the child, so long as the county made reasonable efforts to reunite the family if reasonable efforts were required. *In re Welfare of Child. of T.A.A.*, 702 N.W.2d 703, 708 (Minn. 2005).

The district court's determination that a statutory ground for termination exists and its decision to terminate parental rights are reviewed for an abuse of discretion. *In re Welfare of Child of J.H.*, 968 N.W.2d 593, 600 (Minn. App. 2021), *rev. denied* (Minn. Dec.

9

6, 2021). A district court abuses its discretion if it makes findings of fact that lack evidentiary support, misapplies the law, or resolves discretionary matters in a manner contrary to logic and facts on record. *Woolsey v. Woolsey*, 975 N.W.2d 502, 506 (Minn. 2022). The district court's findings of fact are reviewed for clear error. *J.H.*, 968 N.W.2d at 600. Under a clear-error standard of review, "we view the evidence in a light favorable to the findings." *In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 221 (Minn. 2021). We do not reweigh the evidence, engage in fact-finding, or reconcile conflicting evidence. *Id.* at 221-22.

The district court found three statutory grounds for termination: Minn. Stat. § 260C.301, subd. 1(b)(4) (palpable unfitness), 1(b)(6) (egregious harm), 1(b)(8) (neglected and in foster care). Mother argues that the county did not prove those grounds by clear and convincing evidence.

*Palpable Unfitness*

A district court may terminate parental rights under Minn. Stat. § 260C.301, subd. 1(b)(4), if it finds

> that a parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child.

The district court found that mother is palpably unfit to parent the child based on mother's (1) "inability to adequately supervise" the child, (2) "unwillingness to engage in

10

services" for the child, and (3) "violent and aggressive behaviors," which the child imitated.

The record supports the district court's finding that mother is unable to adequately supervise the child. The child has significant special needs. He is diagnosed with PTSD, disruptive-mood-dysregulation disorder, and attention deficit and hyperactivity disorder. He has been physically aggressive, and he has exhibited suicidal and homicidal ideation requiring inpatient care. Social worker A.G. testified that the child once ran into the street, stating that he wanted to be run over. The child had to switch schools multiple times due to his aggressive behavior and outbursts. And the child was admitted to a long-term residential-treatment program to address those issues.

At trial, the child's therapist and the GAL essentially testified that the child requires a parent who can respond calmly and appropriately when the child dysregulates. They also testified, in effect, that any form of abuse could exacerbate the child's dysregulation and cause him to regress. The district court found that mother did not demonstrate an ability to meet the child's substantial needs despite the services and support offered by the county. The record supports the district court's finding.

The record also supports the district court's finding that mother was unwilling to engage in services for the child. For example, a school social worker testified that, even though mother was given a cell phone and gas vouchers, mother was difficult to contact. In fact, mother never used the phone, and at one point, mother gave the phone to the child instead of using it to make herself available when her help was needed to address the child's behavior school.

11

A.G. testified that, although mother was "engaged with her kids and played with them" at some of her supervised visits, she was disengaged during other visits and ignored her children when they threw objects at each other. On two occasions, the sessions were paused because mother's behavior posed a safety risk to the children.

L.C. testified that although mother was expected to attend the child's medical appointments, she often missed them. When mother was present, she smelled strongly of marijuana and did not engage with the child's care providers, and instead spent most of her time on her cell phone. Mother also failed to administer medication to the child, providing the child with only two doses of a prescription that was to be taken twice a day for two weeks. As a result of that failure, the child could not enter a recommended partial-hospitalization program.

Mother's parenting coach testified that mother did not complete her parenting sessions. And although mother attended services offered to help resolve her past trauma, mother revoked her release of information, which prevented the county from monitoring her mental-health status.

Mother also failed to address her daily marijuana use. Mother's licensed counselor testified that mother would benefit from in-patient treatment to address her significant marijuana use. The counselor explained that mother used marijuana while driving and showed no "motivation to change." A.G. shared similar concerns, testifying that mother's marijuana use had a "significant impact on her ability to learn, retain, and practice" parenting skills.

Finally, the record supports the district court's finding that the child imitated mother's aggressive and violent behavior. A.G. testified that the child constantly spoke about violence and that the child, and his sister, were violent toward each other. A.G. recalled the child using inappropriate language, including "I'm gonna hurt you violently because that's what we do" and testified that the child wanted to be violent because it "makes [him] happy, [that is] what [he] was taught, [and] [that is] what [his] family does." L.C. testified that when the child told mother that he had hit a nurse in the face "really hard" with a tennis ball, mother responded, "That was a good hit son."

Mother argues that there is not clear and convincing evidence that her conduct is part of a "consistent pattern," alleging that the child has made inconsistent statements about the abuse and becomes upset when people "talk[] badly about [his] parents." Mother points to the child's therapist's testimony that the child never disclosed an instance of abuse other than the gas-station incident. But the child's therapist explained that the child generally avoided speaking about the trauma.

Moreover, the child reported other instances of abuse to witnesses who testified at trial. For example, A.G. testified that the child disclosed that he had been "whooped with a belt on more than one occasion" and "slapped with a shoe." Similarly, L.C. testified that the child disclosed that mother had previously used a different belt than the one she used during the gas-station incident. And the child's sister reported that the child "gets whooped with a belt." Regardless, the district court's determination that mother is palpably unfit to care for the child was not based only on the physical abuse mother perpetrated against the child. The district court also reasoned that mother failed to engage in services that she had

13

been offered, encouraged the child's violent behavior, and failed to address the child's special needs.

In sum, clear and convincing evidence supports the district court's determination that mother is palpably unfit under Minn. Stat. § 260C.301, subd. 1(b)(4). The district court did not abuse its discretion by relying on that statutory ground to terminate mother's parental rights.

*Egregious Harm*

The district court also terminated mother's parental rights under Minn. Stat. § 260C.301, subd. 1(b)(6), which allows termination based on a finding

> that a child has experienced egregious harm in the parent's care which is of a nature, duration, or chronicity that indicates a lack of regard for the child's well-being, such that a reasonable person would believe it contrary to the best interest of the child or of any child to be in the parent's care.

Egregious harm is defined as "infliction of bodily harm to a child or neglect of a child which demonstrates a grossly inadequate ability to provide minimally adequate parental care." Minn. Stat. § 260C.007, subd. 14 (2022). Egregious harm includes, among other things, conduct that inflicts "'substantial bodily harm' to a child" and "felony malicious punishment of a child." *Id.*, subd. 14(2)-(3). "'Substantial bodily harm' means bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily member or organ, or which causes a fracture of any bodily member." Minn. Stat. § 609.02, subd. 7a (2022). A parent is guilty of felony malicious punishment of a child if the parent uses

14

"unreasonable force or cruel discipline that is excessive under the circumstances" and the act results in substantial bodily harm to the child. Minn. Stat. § 609.377, subds. 1, 5 (2022).

The district court determined that the child experienced egregious harm while in mother's care during the gas-station incident, finding that mother's conduct "constitute[d] unreasonable force and cruel punishment that is excessive under the circumstances." The district court noted that "[m]other had ample time and several opportunities to cool down and walk away from the assault . . . [but] chose not to do so." The record clearly and convincingly supports that finding. The surveillance footage speaks for itself.

The district court also found that mother caused the child substantial bodily harm "as a direct result of [her] assault at the [gas] station." This finding is clearly supported by the record. The responding police officer took pictures of the child's injuries that showed raised welts and bruises on the child's legs, chest, and back. And the officer testified that the child complained of hearing loss in his right ear.

Mother suggests that because she was convicted of gross-misdemeanor, and not felony malicious punishment of a child, she did not perpetrate egregious harm. *See* Minn. Stat. § 260C.007, subd. 14(3) (defining egregious harm to include felony malicious punishment of a child under Minn. Stat. § 609.377). Although egregious harm includes conduct that constitutes felony malicious punishment of a child, egregious harm does not require a felony conviction. *See In re Welfare of Child. of D.M.T.*, 802 N.W.2d 759, 765-66 (Minn. App. 2011) (concluding mother had inflicted egregious harm on her children based on witness testimony and photographs of the children's injuries, and not based on any conviction).

15

In sum, the district court's egregious-harm finding is supported by the record. Thus, the district court did not abuse its discretion by relying on that statutory ground to terminate mother's parental rights. And because only one statutory ground is necessary for termination and we have concluded that there is clear and convincing support for two of the grounds on which the district court relied, we need not review the remaining ground. *See J.H.*, 968 N.W.2d at 600 (stating that district courts "may terminate parental rights if . . . at least one statutory ground for termination is supported by clear and convincing evidence").

**B.**

Before a district court may terminate a parent's parental rights, it must make "specific findings" and determine "that reasonable efforts to finalize the permanency plan to reunify the child and the parent were made" or "that reasonable efforts for reunification [were] not required." Minn. Stat. § 260C.301, subd. 8 (2022). The district court must make "individualized and explicit findings regarding the nature and extent of efforts made by the social services agency to rehabilitate the parent and reunite the family." *Id.*, subd. 8(1). We review a district court's finding that reasonable efforts were made for clear error. *See In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 87 (Minn. App. 2012) (stating that we review the district court's factual findings for clear error).

In determining whether the county made reasonable efforts, the district court must consider whether the county offered services that were

> (1) selected in collaboration with the child's family and, if appropriate, the child;

16

(2) tailored to the individualized needs of the child and child's family;

(3) relevant to the safety, protection, and well-being of the child;

(4) adequate to meet the individualized needs of the child and family;

(5) culturally appropriate;

(6) available and accessible;

(7) consistent and timely; and

(8) realistic under the circumstances.

Minn. Stat. § 260.012(h) (2022).

In finding that the county made reasonable efforts toward reunification, the district court reasoned that the county involved mother in the child's educational and medical needs, attempted various methods of communication with mother, and provided mother numerous services. The district court also found that the county consistently considered the child's well-being and addressed his trauma.

Those findings are supported by the record, which shows that mother was offered and did not fully utilize the following services: service coordination; referrals for mental-health, chemical-health, and parenting-skills services; emergency assistance, including financial support and transportation vouchers; supervised parenting time; and safety planning. The child was also provided services, including regular medical appointments, admission to the Parents and Children Excel program to address school absences, an Individualized Education Program, "bridging appointments" with a partial-hospitalization program to address the child's mental-health issues, and an eight-month placement in a residential-treatment facility. Despite all of those services, A.G. testified that mother's progress with her case plan "remained stagnant almost the entirety of th[e] case because of

17

[mother's] lack of willingness to engage in . . . services or recognize the worries that [the county] had and to make changes."

Mother asserts that the district court erred in determining that the county made reasonable efforts toward reunification, arguing that she was deprived of parenting time as a result of the DANCO, was not offered family-reunification therapy, and was generally left with the impression that she would be unable to reunify with the child regardless of her efforts. Mother also argues that her "record of compliance with probation" shows she can succeed in supervised programming, so long as the program is willing to work with her in good faith.

Regardless of mother's cooperation with her probation officer, the record supports the district court's findings that mother rejected assistance from county social workers who attempted to work with her and schedule visitation despite the allegations of egregious harm and the DANCO. Indeed, the county could have sought relief from its obligation to make reasonable efforts. *See* Minn. Stat. § 260.012(a) (2022) (providing that the county must make reasonable reunification efforts "except upon a determination by the court that a petition has been filed stating a prima facie case that . . . the parent has subjected a child to egregious harm as defined in section 260C.007, subdivision 14").

Mother asserts that at trial, L.C. testified that the county planned to terminate mother's parental rights regardless of her progress with her case plan. Mother's assertion ignores the rest of L.C.'s testimony. L.C. testified that after the gas-station incident, the county "had to file for [the] TPR." But she also testified that the county "always want[ed]

18

to make sure that [it] work[ed] toward[] reunification." Again, the county did not ask to be relieved of its duty to make reasonable reunification efforts even though it could have done so based on the allegations of egregious harm. *See* Minn. Stat. § 260.012(a). And the county's efforts continued even though mother failed to consistently communicate with the county, failed to behave appropriately during supervised visitation, failed to address her significant marijuana use, and failed to refrain from confrontational and abusive behavior toward county social workers. A.G. testified that she continued to reach out to mother after the March 2023 TPR trial on an "[a]lmost weekly" basis until June 2023, when mother told A.G. to "leave her alone." Communications between the county and mother did not stop until two weeks before the July 2023 TPR trial, after mother forced social workers out of her house and told A.G. to "Get the f--k out of my house."

This record clearly and convincingly supports the district court's finding that the county made reasonable reunification efforts.

## C.

If at least one statutory basis to terminate parental rights exists, the paramount consideration in determining whether parental rights should be terminated is the child's best interests. Minn. Stat. § 260C.301, subd. 7 (2022). Thus, if a district court determines that a statutory ground for termination exists, it must also determine that termination is in the child's best interests before terminating parental rights. *In re Welfare of Child. of J.R.B.*, 805 N.W.2d 895, 905 (Minn. App. 2011), *rev. denied* (Minn. Jan. 6, 2012). "The

'best interests of the child' means all relevant factors to be considered and evaluated." Minn. Stat. § 260C.511(a) (2022).

The district court must explain its rationale for concluding that termination is in the child's best interests after balancing three factors: "(1) the child's interest in preserving the parent-child relationship; (2) the parent's interest in preserving the parent-child relationship; and (3) any competing interest of the child." *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App. 1992); *see* Minn. R. Juv. Prot. P. 58.04(c)(2)(ii) (enumerating best-interests factors outlined in *R.T.B.*). "Where the interests of parent and child conflict, the interests of the child are paramount." Minn. Stat. § 260C.301, subd. 7.

A district court's best-interests determination is reviewed for an abuse of discretion. *J.R.B.*, 805 N.W.2d at 905. "[The] law leaves scant if any room for an appellate court to question the [district] court's balancing of best-interests considerations." *See Vangsness v. Vangsness*, 607 N.W.2d 468, 477 (Minn. App. 2000) (affirming best-interests determination in child-custody case).

The district court considered the relevant factors and found that termination of mother's parental rights was in the best interests of the child. As to the child's interest in preserving the parent-child relationship, the district court found the following:

> The child's interest in preserving the parent-relationship with [m]other weighs in favor of termination. The [GAL] testified [that] the child is "relationship-based." [The child] needs to trust that his needs are going to be met on a consistent basis. However, because of [m]other's actions and behaviors, the [GAL] observed that [the child] no longer trusts adults in his world. [The child] was physically hurt by [m]other to the point of criminal charges. [The child] loves [m]other and the [GAL] has observed the loyalty that [the child] has for his

20

family.  However, although [the child] has loyalty towards his [m]other, it is not always in the child's best interest to remain in her care, especially given the greater safety concerns involved with [m]other's lack of emotional regulation.

As to the parent's interest in preserving the parent-child relationship, the district court found the following:

> Regarding factor two, [m]other has expressed that she loves [the child] and would like to regain custody and care of him, but [m]other has failed to complete most of the services offered to her by the [county].  The [district court] does not doubt that [m]other loves [the child], but [m]other has put her own interests before the needs of [the child].  [The child] needs a safe environment away from any emotionally or physically abusive behaviors and actions. . . .  Mother has not exhibited any change in her parenting skills or emotional regulation.

Finally, as to any competing interest of the child, the district court found the following:

> With respect to factor three, the [district court], in considering the competing interests of [the child], heard testimony from the school social worker, case workers, and the [GAL] that, over time, [the child] has been showing signs of improvement with his medical diagnoses.  [The child] feels safe in foster care and foster care placements have been seeing that his needs are met.  [The child] needs a safe and stable home, and additional support to help with his education and therapy.  Due to the ongoing services that [the child] needs and [m]other's lack of demonstration that she can maintain those services—whether it is through her parenting time or inability to obtain services herself—[m]other has failed to demonstrate that she can provide [the child] with the consistency, stability, and support he has received while in his foster care placements.

Mother argues, in part, that the district court's best-interests determination constitutes an abuse of discretion because (1) the gas-station incident was an "isolated" incident, (2) the child told one of his therapists that his mother does not make him feel

21

unsafe and that he does not like it when others talk badly about his parents, and (3) any deficiency in mother's efforts was due to the agency's decision "not to work with her in good faith."

Mother's best-interests argument is partly based on the factors set forth in Minn. Stat. § 260C.212, subd. 2 (2022). But Minn. Stat. § 260C.212, subd. 2, does not apply to a best-interests determination in a TPR proceeding. *See In re Welfare of Child. of M.L.S.*, 964 N.W.2d 441, 452-53 n.6 (Minn. App. 2021) (identifying "different best interests [factors] for different circumstances[,]" including those governing placement determinations and termination of parental rights). The applicable best-interests factors in this termination case are the three factors set forth in Minn. R. Juv. Prot. P. 58.04(c)(2)(ii). *In re Welfare of Child of J.R.R.*, 943 N.W.2d 661, 669 (Minn. App. 2020). We therefore do not address mother's arguments regarding the factors set forth in Minn. Stat. § 260C.212, subd. 2(b).

The record shows that the district court thoughtfully applied the correct best-interests factors and did not abuse its discretion in determining that termination of mother's parental rights was in the child's best interests. We discern no abuse of discretion.

**D.**

Mother asserts that the district court violated her right to procedural due process by failing to explain its express credibility determinations. She argues that the district court needed to explain why certain witnesses were more credible than others, and she complains

that the district court found all of the county's witnesses credible and many of her witnesses not credible.

Parents have a right to procedural due process in child-protection cases. *In re Welfare of Child. of D.F.*, 752 N.W.2d 88, 97 (Minn. App. 2008) ("The parent-child relationship is among the fundamental rights protected by the constitutional guarantees of due process."); *see J.H.*, 968 N.W.2d at 605 (identifying three-part balancing test used to determine whether a parent's procedural due-process rights were violated in a TPR proceeding). However, as the appealing party, mother has the burden to establish prejudicial error. *See A.J.S. v. M.T.H.*, 573 N.W.2d 99, 102 (Minn. App. 1998) ("We cannot assume district court error."); *see also In re Welfare of D.D.R.*, 713 N.W.2d 891, 904 (Minn. App. 2006) ("On appeal, the appellant has the burden of establishing that the [district] court abused its discretion and that appellant was thereby prejudiced." (quotation omitted)).

Mother does not cite any binding authority indicating that a district court must explain its express credibility determinations in a TPR proceeding. And we are not aware of any authority requiring the district court to do so. Mere assertions of error without supporting legal authority or legal argument are forfeited "unless prejudicial error is obvious on mere inspection." *Scheffler v. City of Anoka*, 890 N.W.2d 437, 451 (Minn. App. 2017), *rev. denied* (Minn. Apr. 26, 2017); *see also In re E.M.B.*, 987 N.W.2d 597, 600 n.5 (Minn. App. 2023) (citing *Scheffler* in a grandparent-visitation appeal).

Because mother's due-process claim is not adequately supported or argued and we discern no obvious prejudicial error stemming from the district court's express credibility

determinations, that claim is forfeited. *See State, Dep't of Lab. & Indus. v. Wintz Parcel Drivers, Inc.*, 558 N.W.2d 480, 480 (Minn. 1997) (declining to address an inadequately briefed question); *see also In re Child of P.T.*, 657 N.W.2d 577, 586 n.1 (Minn. App. 2003) (applying *Wintz* in an appeal regarding termination of parental rights), *rev. denied* (Minn. Apr. 15, 2003).

## II.

Father challenges the district court's authorization of the default proceeding against him, arguing that he was improperly served by publication because "there is no evidence in the record that the district court approved publication in Olmsted County, Minnesota, when [father's] last addresses were in Chicago, Illinois." *See* Minn. R. Juv. Prot. P. 16.02, subd. 3 (requiring service by publication in a location approved by the district court). Father complains that the county made no effort "to ensure that [he] could attend the trial" after it filed an affidavit of diligent efforts in November 2022, even though the county later had contact with father twice in January 2023 and knew that father was incarcerated in Kentucky. Father did not raise this issue in the district court.

If a party does not bring a posttrial motion for relief, our review is limited to "whether the evidence sustains the findings of fact[,] whether such findings sustain the conclusions of law and the judgment," and "substantive legal questions . . . properly raised during trial." *In re Welfare of Child of S.S.W.*, 767 N.W.2d 723, 733 (Minn. App. 2009) (quotation omitted); *see In re Welfare of C.L.L.*, 310 N.W.2d 555, 557 (Minn. 1981) (concluding that father's constitutional challenge to the district court's order

24

terminating his parental rights was outside the scope of appellate review because it was not raised to the district court).

The issue that father raises on appeal is beyond our limited scope of review. And the record does not suggest a reason to extend review that is otherwise unavailable. *See* Minn. R. Civ. App. P. 103.04 (appellate courts may provide review as "the interest of justice may require"). The record shows that father contacted A.G. around January 2023, participated in a family-group conference regarding mother and the child, and was aware of the child-protection proceeding. There is no indication that father attempted to participate in the termination proceeding by contacting the county or the court after January 2023.

Perhaps father has an explanation for his failure to appear for trial despite a record indicating that he was aware of the termination proceeding, that he participated in a family-group conference during the proceeding, that he demonstrated an ability to contact the assigned social worker, and that he demonstrated the ability to file a timely appeal. *See* Minn. R. Juv. Prot. P. 23.02, subd. 2 (providing 20 days to appeal from notice of a final order in a child-protection matter). But father has not offered an explanation on appeal. Regardless, if he had an explanation for his failure to appear for trial, it should have been presented in the first instance to the district court. *See* Minn. R. Juv. Prot. P. 21.01, subd. 1 (allowing posttrial motions), 22.02 (providing 90 days to move for relief from a default order).

In sum, father's arguments for relief are forfeited.

**Affirmed.**